UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA ) )
v. )      **Criminal No. 06-40034-FDS**
AMIT MATHUR, )
           **Defendant** )
_____ )

### GOVERNMENT'S SENTENCING MEMORANDUM AND
### OPPOSITION TO DEFENDANT'S REQUEST FOR DOWNWARD DEPARTURE

      Mathur was convicted on May 16, 2008, after a ten-day jury trial, of 18 counts of mail fraud and two counts of wire fraud stemming from his role in Entrust Capital Management ("ECM"), which Mathur held out as an entity that ran a hedge fund comprised of publicly traded securities. The United States of America submits this memorandum in support of its recommendation that the Court impose a sentence at the low end of the advisory GSR – 210 months – and to respond to Mathur's arguments that the Court should depart from the GSR. In this memorandum, the government presents (1) a brief summary of the offense conduct; (2) the government's position on the calculation of the advisory Sentencing Guidelines; (3) the government's opposition to the defendant's requests for a downward departure; and (4) and an explanation of the government's sentencing recommendation.

## I.    Offense Conduct

      The offense conduct is summarized in the PSR at ¶¶ 8-16. Rather than review the evidence in detail here, the government focuses on several factual points that it believes are especially material to the Court's determination. As the jury found, Mathur engaged in massive fraud scheme that spanned the period from 2001 to 2005. As discussed throughout this memorandum, Mathur's conduct was remarkable and particularly worthy of a lengthy sentence of incarceration because the factual record demonstrates the defendant's refusal to curb his

conduct despite opportunities to do so, his indifference to the harm he caused his victims, his attempts to obstruct justice and avoid responsibility, and his continued utter lack of contrition.

First, Mathur began his fraud scheme at approximately the same time he had been barred by the NASD from involvement in securities transactions.  His criminal intent was thus aggravated by engaging in the precise type of crime the NASD bar aimed to curb.  Second, Mathur preyed on victims with whom he had a special trust relationship, such as his uncle, Alok Mathur, and his girlfriends' relatives, Anthony and Heidi Bello.  Third, when confronted directly with his victims' concerns about the safety of their investments, Mathur continued his deception, indifferent to the harm he knew he was causing.  Thus, when Alok Mathur, who had entrusted his life's savings to Mathur, lost his job and told Mathur that his primary concern was the safety of his investment – which Mathur had misappropriated without investing a penny of it – the defendant reassured Alok that his money was safe.  Fourth, when the SEC began investigating ECM, Mathur took a number of steps to mislead the SEC and obstruct justice.  Finally, Mathur continues, in his submissions to the Probation Office and his factual assertions through counsel, to demonstrate that he takes no responsibility for his conduct and feels no remorse.

## II.    Calculation of Advisory GSR

The government agrees with the PSR's application of the advisory guidelines.  See PSR ¶¶ 32-42.  Based on this application of the guidelines and a criminal history category of I, Mathur's advisory GSR is 210-262 months.  While Mathur does not appear to contest the base offense level, he takes issue with each of the enhancements applied by the PSR.  The government will address each enhancement in turn.

### A.    Loss Amount

"The government bears the burden of proving a victim's losses by a preponderance of evidence."  United States v. Curran, 525 F.3d 74, 78 (1st Cir. 2008); United States v. Acosta, 303

F.3d 78, 82 (1st Cir. 2002).  "Determination of actual loss need not be precise; the court need only make a reasonable estimate of the range of loss, given the available information."  Id.  Here, the loss amount reflected in the PSR is substantiated by evidence presented at trial.

The linchpin of Mathur's challenge to the addition of 20 levels based on a loss amount greater than $7 million (PSR ¶ 33) is his claim that David Massad's losses should not be counted.  See Def. Memo. at 7-25.  However, the unrefuted trial evidence showed Massad in fact lost in excess of $7 million.  Starting in October 2000, Massad gave Mathur money on several occasions to invest in what he understood to be the ECM hedge fund, including check for $5 million that Massad gave Mathur for investment in the hedge fund.   T.6:9-10, 151; 6:20-21.

In addition, in June and July 2003, Massad gave Mathur $8,787,500 for purchase of preferred shares of GMAC and Ford.  PSR ¶ 12; T.5:160; T.6:100-111.  Massad instructed Mathur to purchase those specific preferred shares and understood that the funds would not be invested in the hedge fund. [Id. and T.5:165].  In June and August 2003, Massad's son-in-law, David Mandera, received ECM statements confirming Mathur's receipt of those funds and confirming that ECM received them for the purpose of purchasing Ford and GMAC stock.  T.6:104-111; and see Trial Exs. 23D and 23G (copies attached hereto as Exhibit A).   From September 2003 until January 2005, Mandera received  approximately $160,000 from Mathur each quarter, which Mandera understood to be quarterly dividend payments on the Ford and GMAC preferred stock.  T.6:111-119.  Thus, Mandera, on Massad's behalf, received approximately $960,000 in phony dividend payments before the scheme was uncovered.

Subtracting the phony dividend payments Mandera received from the $8,787,500 Mathur took from Massad under the guise of purchasing preferred stock yields a amount in excess of $7 million.  Thus, even without addressing losses Massad suffered by virtue of payments he

believed were going into the hedge fund or losses suffered by other victims, the evidence

supports the 20-level enhancement applied by the PSR.

### B.     Number of Victims

The government agrees with the PSR's conclusion that the offense involved 10 or more

victims and that a two-level enhancement is therefore required, under to U.S.S.G. § 2B1.1

(b)(2)(A)(i).  See PSR ¶ 34.  With regard to seven victims, i.e. the six who testified at trial –

Alok Mathur, George Soued, Stephen Lograsso, David Massad, and Pamela Massad – and

Aparajita Mathur (Alok Mathur's wife),[1] the trial record makes abundantly clear that they are

victims.  Of the remaining victims identified by the government,  Philip Massad and Suzanne

Benoit were interviewed by the SEC in 2005 and their description of their losses was

memorialized in an affidavit filed with this Court in SEC v. Mathur, Civil Action No. 05-10729-

MLW.  See Affidavit of Risa King, Exhibit B hereto.[2]  The losses suffered by another two

victims – Heidi Bello and her brother Anthony Bello – are documented in a memorandum of

interview provided to defense.  Mathur does not appear to challenge the status of Philip Massad,

Heidi Bello, or Anthony Bello as victims and his objection to Ms. Benoit is solely the claim that

the government has not provided documentation that she is a victim, which assertion Exhibit B

---

[1]Based on the fraud Guidelines definition of victim, it is likely there are several other spouses who are victims because they sustained "part of the actual loss."  See § 2B1.1 cmt. n.1; and United States v. Denmore, 210 Fed. Appx. 965, 971 (11th Cir. 2006)(unpublished opinion) (affirming court's inclusion of both husbands and wives as victims of fraud scheme where money invested was either derived from jointly held accounts or the investment was made on behalf of both.  Aparajita Mathur is identified on the ECM account statements sent to her and her husband.  See, e.g., Trial Exh. 8F.  Although it is likely that the other victims, each of whom testified to being married, invested funds held in accounts jointly held with their spouses, the issue is academic because there were more than ten victims even excluding other spouses.

[2]Ms. King's affidavit is part of the evidentiary appendix in the SEC's civil action againsgt Mathur.  See Civil Action No. 05-10729-MLW, Docket Entry 6.

demonstrates is incorrect.   Thus, the total number of victims as to which there is no serious

dispute is at least 11.

Mathur asks the Court not to count David Massad based, in essence, on the assertion that

Massad "owns" Entrust.  See Def. Memo. at 11-25.  As discussed in the Government's

Opposition to Motion for a New Trial (see Docket Entry No. 101 to this action), this assertion is

demonstrably untrue.  Nor is there any merit to Mathur's claim that Pamela Massad is not a

victim because "she was fully reimbursed by her father. . . ."  Def. Memo. at 31.  Even assuming

Ms. Massad was reimbursed by her father, Mathur cites no authority – and the government is

aware of none – for the proposition that a victim's receipt of "reimbursement" from a family

member is relevant to her status as a victim.

### C.    Violation of Prior Order, Injunction, or Decree

The government agrees with the PSR's inclusion of a two-level enhancement for

Mathur's violation of a prior, specific judicial or administrative order, injunction or decree.  See

PSR ¶ 35 and U.S.S.G. § 2B1.1 (b)(8)(C).  This enhancement applies because Mathur operated

ECM and conducted trades through Kimball and Cross after the NASD had barred him from

working in association with other NASD members.  See § 2B1.1 cmt. n. 5(C) (increase applies

when defendant's criminal conduct constitutes fraud in violation of, inter alia, an official

administrative warning "in the form of an order, injunction, decree, or process, to take or not

take a specified action.").  Mathur does not challenge the factual predicate for the enhancement,

which is that, "[p]rior to Mathur's [commission of the crimes of conviction], the National

Association of Securities Dealers (NASD) had barred the defendant from acting as a financial

adviser or working in association with any NASD member in any capacity."  PSR ¶ 14.  Nor

does Mathur contest that Kimball and Cross and LaSalle Street Securities, entities with which he

dealt while operating ECM, are NASD members.  Id.  Instead, Mathur's challenge is a legal one: he asserts that the NASD is not an "administrative agency."  This argument is without merit.

The bar imposed by the NASD was an "administrative order, injunction, or decree" within the contemplation of § 2B1.1 (b)(8)(C), as evidenced by the central role the NASD plays in the regulatory scheme established by the Securities Exchange Act or 1934 ("the Exchange Act).  See Merrill Lynch v. NASD, 616 F.2d 1363,1366-67 (5th Cir. 1980).  "By the Act Congress granted cooperative organizations of investment bankers, dealers and brokers self-regulatory authority over their own members in order to attain and preserve the highest standards of legal and ethical behavior in the nation's securities markets."  Id. at 1366; and see Feins v. American Stock Exch, 81 F.3d 1215, 1218 (2nd Cir. 1996 (describing the Exchange Act's "comprehensive regulatory scheme for the securities industry" as one that "establishes a scheme of regulation of the securities marketplace").  The NASD is the only securities association registered with the SEC pursuant to statutory authorization.    Merrill Lynch, 616 F.2d at 1367.  As such, "it has been delegated governmental power in order to enforce, at (its) own initiative, compliance by members of the industry with both the legal requirements laid down in the Exchange Act and ethical standards going beyond those requirements."  Id. (citation to legislative history omitted).[3]  Like action by other agencies, such as the SEC itself, action taken by the NASD is subject to challenge by aggrieved parties and tiers of administrative review."  Id.

---

[3]Even the article upon which Mathur relies, published in United States Attorney's Bulletin, describes the NASD and other self-regulatory organizations operating pursuant to the Exchange Act, as "the first-line regulators of broker-dealers. . . ."  Lee and Petillon, Overview of Federal Securities Laws, at 9 (cited in Def. Memo. at 34)(n.b. Mathur incorrectly cites the article as Hruska, The President's Corporate Fraud Task Force).  The article notes the NASD's authority to "discipline and sanction [its] members, and establish rules to ensure market integrity an investor protection, all under the oversight of the SEC."  Id.

Cases upholding the application of this enhancement and the commentary to § 2B1.1 (b)(8)(C) demonstrate that Mathur's conduct is precisely what the enhancement contemplates. See, e.g., United States v. Mantas, 274 F.3d 1127, 1132 (7th Cir. 2001) (upholding application of enhancement against seller of poultry and meat where Illinois Department of Agriculture inspectors had issued an informal decree that selling the goods at issue would violate state law); United States v. Spencer, 129 F.3d 246, 252 (7th Cir. 1997) (upholding enhancement where defendant agreed informally with the Department of Transportation to terminate involvement with airline and subsequently committed offense involving airline); United States v. Thaler, 229 Fed. Appx 7, 2007 WL 1098114, *2 (2nd Cir. 2007)(unpublished opinion)(upholding application enhancement against disbarred attorney whose criminal conduct involved the practice of law, in violation of the disbarment order); United States v. LaMonda, 2008 WL 68744 (M.D. Fl. 2008)(unpublished Sentencing Memorandum)(applying enhancement where defendant's conduct violated consent order by Floridae Dept. of Insurance).  These cases make clear that the enhancement applies where a defendant's criminal conduct independently violates a prior administrative warning because acting in violation of such a warning "demonstrates aggravated criminal intent and deserves additional punishment." LaMonda at *15 (quoting § 2B1.1 cmt. n. 7(C);[4] see also Spencer, 129 F.3d at 252 (noting that, where the DOT "went to considerable lengths to prevent [the defendant] from participating in [the airline], [the defendant's conduct] demonstrated the same aggravated criminal intent underlying [the enhancement]." Id. (citation and internal quotation marks omitted).  Likewise here, the NASD sought to ensure that Mathur would not participate in securities markets in a professional capacity.  Mathur's conduct

---

[4]At the time LaMonda was sentenced, the Commentary provision was codified at § 2B1.1 cmt. n. 5(C).

thwarted the NASD's attempt to protect the public and demonstrated the aggravated criminal intent of which the Guidelines speak.  This Court should apply this enhancement.

  **C.**  **Violation of Securities Law By Investment Adviser**

  The PSR correctly applies a four-level increase to Mathur's offense level because he was, at the time of the offense, "an investment adviser, or a person associated with an investment adviser."  PSR para36; and <u>see</u> U.S.S.G. § 2B1.1 (b)(16)(A)(iii).  Mathur's challenge to the application of this enhancement is based on the assertion that the sole basis for the enhancement is conduct that preceded the date on which the Guideline took effect, November 2003.  That conduct, Mathur asserts was his recommendation to David Massad, earlier in 2003, that Massad purchase Ford and GMAC stock.  This argument fails at its premise because it relies on an unduly narrow reading of the Guideline.[5]  Application of the investment adviser enhancement is supported by Mathur's numerous misrepresentations to people he led to believe were investing in a fantastically successful hedge fund.  Those misrepresentations continued beyond November 2003 and did not cease until the SEC uncovered the fraud in 2005.  Moreover, even Mathur's challenge to the enhancement based on advise to Massad concerning Ford and GMAC stock is without merit.  Mathur continued to send Massad (via Mandera) fake dividend checks until January 2005.  These checks were, in essence, investment advise regarding the wisdom of holding on to those stocks.  Thus, Mathur's conduct in causing the delivery of those fake

---

  [5]To the extent Mathur is making an <u>ex</u> <u>post</u> <u>facto</u> argument, his claim is equally unavailing.  Amendments to the sentencing guidelines apply to all offenses committed on or after the stated effective date of the revised edition.  It is well established that the sentencing guidelines apply to offenses that straddle the effective date of the guidelines.  <u>United States v. Rostoff</u>, 53 F.3d, 398, 404 (1st Cir. 1995).  The First Circuit has made clear that, where a continued criminal offense straddles the former and revised editions of the sentencing guidelines, application of the new version does not violate the <u>ex post</u> <u>facto</u> clause of the Constitution.  <u>United States v. Regan</u>, 989 F.2d 44, 48 (1st Cir. 1993).  By way of example, the First Circuit has treated mail fraud charges as straddling the enactment of guidelines when connected to a scheme to defraud.  <u>United States v. Starck</u>, 974 F.23d 1329 (table) (1st Cir. 1992).

dividend checks provides an independent basis for application of the investment adviser enhancement.

Mathur does not, and cannot, claim that § 2B1.1 (b)(16)(A)(iii) does not apply to offense conduct continuing beyond the effective date.  The enhancement applies if the offense involved "a violation of securities law and, at the time of the offense, the defendant was . . . [a]n investment adviser, or a person associated with an investment adviser. . . ."  § 2B1.1 (b)(16)(A)(iii).  Mathur's offenses involved a violations of securities law.  A "violation of securities law" includes a violation of the Exchange Act, 15. U.S.C. § 78a et seq.  See § 2B1.1 cmt. n. 14(A).[6]  Under the Exchange Act, it is unlawful "for any person, directly or indirectly, by the use . . .the mails . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 (1976) (internal quotation marks omitted).  Thus, the crimes of conviction were themselves violations of a securities law.

Moreover, at all relevant times, Mathur acted as both an investment adviser and as a person associated with an investment adviser.  As used in the relevant Guideline, the terms "investment adviser" and "person associated with an investment adviser" are defined as in Section 202 of the Investment Advisers Act of 1940. See U.S.S.G. § 2B1.1, cmt. n. 14(A).  That statute defines "investment adviser" to include "any person who . . . engages in the business of

---

[6]This commentary provision defines "Securities law" to include those provisions of law referred to in Section (3)(A)(47) of the the Exchange Act, 15 U.S.C. § 78c(A)(47) which refers to the entire Exchange Act.  § 2B1.1 cmt. N. 14(A).

advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who ... issues or promulgates analyses or reports concerning securities."  Investment Advisers Act of 1940, § 202(a)(11) (codified as amended at 15 U.S.C. § 80b-2(a)(11)).  "Person associated with an investment adviser" is defined as "any partner, officer, or director of such investment adviser." Investment Advisers Act of 1940, § 202(a)(17) (codified as amended at 15 U.S.C. § 80b-2(a)(17). These definitions describe Mathur's conduct in this case.

In his efforts to recruit ECM hedge fund investors, Mathur advised potential investors that placing money in the ECM hedge fund would be beneficial to them and would yield high returns with minimal risk.  See, e.g. T. 2:62-63; T.2:135-36; T.5:149; T.7:23-24.  He provided them brochures and market analysis to lull them into a belief that the fund was a good investment.  See, e.g., T.2:71 et seq. (testimony by victim Alok Mathur concerning his receipt from Mathur of an ECM brochure and frequent e-mails offering market analysis).  Moreover, once the investors had given Mathur their money, he continued to provide updates on the status of their investments.  See, e.g. T.2:67-68; 155; T.7:28.  He also distributed periodic statements purporting to show the investors the current value of their investments. See, e.g. T.2:88-90, 126-27.  Thus, Mathur acted as an investment adviser until the SEC discovered his fraud.

**D.** **Obstruction of Justice**

The government concurs with the Probation Office's application of a two-level enhancement based on obstruction justice during the investigation of this case.  PSR ¶ 39; and see U.S.S.G. § 3C1.1.  Among the conduct covered by this Guideline is "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation . . . or attempting to do so." U.S.S.G. § 3C1.1, cmt. n. 4(d). The First Circuit has endorsed application of the obstruction enhancement on facts similar to

those in this case.  See <u>United States v. Feldman</u>, 83 F.3d 9, 12–13  (1st Cir. 1996) (enhancement

appropriate where defendant, aware of FBI probe, incinerated documents material to

investigation, i.e. documents that "could have influenced or affected the official investigation

into his fraud").   This enhancement is thoroughly appropriate here and supported by a pattern by

Mathur of attempting to mislead and misdirect the SEC through deception, fabrication of false

documents, and attempts to have investors to destroy inculpatory documents.

First, when interviewed by the SEC in January 2005, Mathur told the SEC examiner that

he had "nothing to do with the hedge fund portion of the business [ECM]; he only worked on the

real estate venture."  Declaration of Philmore Beazer (Exhibit C hereto) at ¶3.[7]   Mathur further

told the SEC examiner that "the hedge fund is run by, and all trading was conducted by his

partner Rajeev Johar out of Louisiana."  <u>Id.</u> at ¶7.  Mathur also told the SEC examiner that "the

only account used by Entrust since its inception to trade marketable securities" was an account at

National Financial Services.  <u>Id.</u> at ¶8.  As the trial record makes clear, Mathur knew each of

these statements to be false in January 2005.  The only reasonable inference that can be drawn

from these lies by Mathur was that they were his attempt to impede the SEC's investigation and

falsely exculpate himself.

The next step in Mathur's attempt to mislead the SEC was his role in providing the SEC

false ECM statements purporting to show losses in Massad's account for the years 2002-2004.

This aspect of Mathur's deception only came to the government's attention recently in light of

his newly-minted attempt to deceive this Court into believing that, in 2005, Mathur was unaware

that attorney John A. Sten of the law firm Greenberg Traurig represented both Mathur and David

Massad at the inception of the SEC's investigation into ECM.  <u>See</u> Def. Mem. at 9-10 (asserting,

---

[7]Mr. Beazer's declaration is part of the evidentiary appendix in the SEC's civil action
against Mathur.  <u>See</u> Civil Action No. 05-10729-MLW, Docket Entry 6.

inter alia, that "Mathur . . . himself did not know about this dual representation until it came to light in the SEC's memorandum."). This claim is especially brazen because, according to Mr. Sten, the only contact John Sten ever had with David Massad was a telephonic conversation in which Mathur participated.[8] Moreover, the sole purpose of Sten's representation of Massad was to transmit to the SEC three pages of documents that Mathur told Sten were being provided by Massad. See Exhibit D hereto, which consists of (1) a fax received by Sten, along with documents attached thereto and (2) Sten's letter to the SEC transmitting those documents. These documents were the essentially the same documents that Mathur's accomplice, Johar, had provided to the SEC during an SEC examination conducted at Johar's office in Louisiana. See Declaration of Kenneth Leung (Exhibit E hereto) at ¶4 and attached statements.[9] Sten received these documents under a fax cover sheet that purported to be from Commerce Bank, David Massad's business. However, that fax cover sheet was itself a counterfeit; i.e. it did not resemble a fax cover sheet used by Commerce Bank. See Affidavit of Belliveau (Exhibit F hereto) (showing both legitimate Commerce Bank fax cover sheets and the cover sheet accompanying what Mr. Sten received). It is thus evident that Mathur decided to dupe his attorney into being the conduit for documents manufactured by Johar; introduced his attorney to Massad or somebody posing as Massad to accomplish this deceit; and now seeks to persuade this Court that he was surprised to learn three years later that his attorney had represented Massad.

---

[8]The government expects Mr. Sten to provide a letter explaining this, which the government will, with leave of the Court, offer as a supplement to this memorandum.

[9]Mr. Leung's declaration is also part of the evidentiary appendix in the SEC's civil action against Mathur. Of the bogus ECM statements Johar provided to Leung, only those purporting to be David Massad's year-end reports are attached hereto.

Finally, as several witnesses testified at trial, in April 2005, Mathur held a meeting in Princeton, New Jersey, at which he sought to persuade several investors to destroy ECM statements they had received showing gains in the hedge fund and replace them with statements showing losses.  <u>See</u> , <u>e.g.</u>, T.2:162-65; T.3:77-78 and 81. When the investors at that meeting expressed concern about the actual value of their investments, Mathur assured them that their money was safe and increasing in value.  <u>Id.</u>  Mathur tried to persuade the investors, and now asks this Court to believe that his purpose was merely "to assist his investor-friends to avoid paying taxes unnecessarily.  Def. Mem. at 36.  This of course cannot be true because Mathur had spent or lost nearly all of his investors' money and, therefore, they would have no tax liability to avoid.  The far more natural inference is that Mathur was seeking to enlist his victims' help in destroying incriminating evidence.  Because Mathur's actions constitute an attempt willfully to obstruct the administration of justice with respect to the investigation of fraud, this Court should apply the obstruction-of-justice enhancement.

## III. <u>Mathur Has Not Shown That a Departure From the Advisory GSR is Warranted</u>

Mathur advances three departure arguments, each of which warrants fairly short shrift. First, Mathur asserts that the Court should depart because Johar fled the country. Mathur then makes two related mental health arguments.  The government will address each in turn.

### A. <u>Johar's Flight From Prosecution Is Irrelevant to the Sentencing Decision</u>

Mathur cites no authority, nor is the government aware of any, for the proposition that a defendant should benefit from the flight from prosecution of an accomplice.  Nor is there any factual support for Mathur's assertion that the government "allow[ed] Johar to flee."  The record is to the contrary.  Before fleeing Johar had agreed to plead to an Information charging him with conspiracy in connection with his role in the ECM fraud, as evidence by the filing of that Information with this Court.

Even had Mathur and Johar been charged together, leniency toward Johar would not support a downward departure for Mathur.  See United States v. Wogan, 938 F.2d 1446, 1448 (1st Cir. 1991)("perceived need to equalize sentencing outcomes for similarly situated codefendants, without more, will not permit a departure from a properly calculated guideline sentencing range.").  Moreover, as the First Circuit has explained, to the extent the (now advisory) Guidelines reflect the Congressional goal of eliminating unwarranted disparities, they seek to do so nationwide, and not with respect to co-defendants.  United States v. Joyner, 924 F.2d 454, 460-461 (2nd Cir. 1991).   The Court explained that:

> An applicable guideline range may seem harsh (or lenient) when compared to that of a co-defendant, but it is the same range applicable throughout the country for all offenders with the same combination of offense conduct . . . To reduce the sentence by a departure because . . . the applicable range punishes the defendant too severely compared to a co-defendant creates a new and entirely unwarranted disparity between the defendant's sentence and that of all similarly situated defendants throughout the country.

Id.

To the extent Mathur is complaining that Johar was charged more leniently before he fled, that argument is equally lacking in merit.  "In the federal system, prosecutors have always enjoyed great discretion in deciding what cases to pursue and what charges to bring."  United States v. Rodriguez, 162 F.3d 135, 151 (1st Cir. 1998) (citation omitted).  In Rodriguez, the court rejected a challenge based on charging disparities among co-conspirators, noting that it is "within the government's discretion to charge similarly situated defendants differently."  Id. at 153.

### B. Mathur's Mental Health Arguments

### 1. Mathur Cannot Establish That He Suffered From Diminished Capacity

This Court should deny Mathur's motion for a diminished capacity departure because Mathur cannot satisfy his burden of showing that his mental condition substantially diminished

his capacity to assess the wrongfulness of his conduct and conform his behavior appropriately. To warrant a departure under U.S.S.G. § 5K2.13, a defendant must demonstrate that he suffered from a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior the defendant knows is wrongful." U.S.S.G. § 5K2.13, cmt. n.1. The burden of proving causation rests on the defendant. United States v. Regan, 989 F.2d 44, 45 (1st Cir. 1993). To prove causation, the defendant must show that the reduced mental capacity contributed to "some extent to the commission of the offense." United States v. Lauzon, 938 F.2d 326, 331 (1st Cir. 1991).

Mathur's argument for a diminished-capacity departure rests nearly exclusively on the report of psychotherapist Roger H. Gray. Dr. Gray bases his report on two meetings with Mathur, conducted within the past five months – more than eight years after Mathur embarked on his fraud scheme – and lasting a total of approximately four hours. When interviewed by the Probation Office, prior to meeting Dr. Gray, Mathur reported no history of mental or psychological problems, see PSR ¶74-76, no history of drug abuse, and a history of alcohol abuse that was unremarkable until 2004-05 when his fraud scheme was unraveling and his business "came crashing down." PSR ¶77-78. Though he reported difficulty adjusting to living in this country when he moved here as a child, because of his accent, Mathur's description of his childhood was unremarkable as well. See PSR ¶¶ 52-56.

Dr. Gray's evaluation of Mathur was based solely on self-reporting by Mathur at a time when Mathur understood that it was in his interest to present his mental health in a light that would invite leniency at sentencing. The Court should therefore be appropriately skeptical of the bases for Dr. Gray's assertions concerning the difficulties Mathur has encountered in life. It should not be gainsaid lightly that the dissolution of a marriage and learning that one is (or may be) adopted are painful experiences. However, they are not extraordinary experiences and they

do not normally cause – nor does Dr. Gray explain how they might cause – a diminution in the capacity to assess the wrongfulness of one's conduct and conform one's behavior appropriately.[10]  The Court should be especially skeptical of Dr. Gray's conclusions because they are based in part on the doctor's uncritical acceptance of Mathur's account of being duped by Johar and Zannotti and assertion that Mathur was unaware of the fraud scheme.

Assuming <u>arguendo</u> that Mathur suffers from the disorders Dr. Gray describes, his mental condition still does not warrant a departure.  Courts have regularly denied motions for downward departures based on claims of reduced mental capacity where the medical and psychological conditions present were comparable to those reported by Dr. Gray.  <u>See</u> <u>Goossens</u>, 84 F.3d at 701 (evidence, including psychological report diagnosing Axis I Dysthymic Disorder and Generalized Anxiety Disorder, did not support finding that defendant suffered from significantly reduced mental capacity); <u>United States v. Johnson</u>, 979 F.2d 396, 400-401 (6th Cir. 1992) ("severe adjustment disorder" not sufficiently unusual to warrant departure).

Moreover, "[t]o qualify for a departure under U.S.S.G. § 5K2.13, the defendant must be suffering from something more than 'emotional problems.'"  <u>United States v. Janusz</u>, 986 F. Supp. 328, 330 (D. Ma. 1997), and <u>see</u> <u>United States v. Withers</u>, 100 F.3d 1142, 1147-48 (4th Cir. 1996).  Rather, the defendant "must show an inability to process information or to reason." <u>Withers</u>, 100 F.3d at 1148.  The evidence here is all to the contrary.  Throughout the life of his fraud scheme Mathur was highly functional.  He was able to persuade his victims that ECM was a good investment; send them monthly statements misrepresenting the performance of their investment (which required reconciling current statements with previous ones); and, on at least one occasion, persuade a restive investor (Alok Mathur) who had lost his job and was

---

[10]Nor does Dr. Gray explain how he concludes it is probable that Mathur suffers from bipolar disorder or the significance of such a diagnosis.

contemplating safer investment options, that the safest course was to leave his money in ECM.

What most powerfully undermines Mathur's diminished capacity claim, though, is his conduct

when his fraud was discovered.  He was sufficiently cognizant of the wrongfulness of his

conduct to (1) lie to the SEC about his role in ECM; (2) lie to investors about the nature of the

SEC inquiry, claiming that it was merely about the rights to the name "Entrust"; (3) attempt to

mislead the SEC by providing the SEC account statements for David Massad showing losses in

his account; and (4) counsel investors to destroy incriminating documents.  These actions are

thoroughly inconsistent with an inability to appreciate the wrongfulness of one's conduct.

Numerous courts have concluded that the complex nature of a crime undermines a claim

that the defendant was suffering from "a significantly reduced mental capacity" during the

course of the crime.  See, e.g., United States v. Leandre, 132 F.3d 796, 805 (D.C. Cir. 1998)

("The mental acumen required for the planning, preparation, and execution of a crime is a logical

starting place" for evaluating a defendant's cognitive capacity); United States v. Goossens, 84

F.3d 697, 701 (4th Cir. 1996) (noting that the fact that defendant "was conscious enough of his

conduct to encrypt the pornographic material on his computer to avoid detection" indicated "a

high level of mental functioning on his part"); Regan, 989 F.2d at 46 (even accepting

defendant's claim of being delusional, departure was unwarranted because there was no evidence

that his cognitive capacities were impaired by them).

### 2. **Mathur Cannot Show That Mental Condition Departure is Warranted**

Nor does Mathur's § 5H1.3 argument have any merit.  "[D]epartures based upon a

defendant's mental condition are discouraged."  United States v. Maldonado-Montalvo, 356 F.3d

65, 74 (1st Cir. 2003).  To depart downward under § 5H1.3, the Court must find that the

defendant's mental condition presents an 'extraordinary' or 'atypical' case."  Id.  In Maldonado-

Montalvo, the Court held upheld the denial of a departure request where the defendant suffered

from severe depression, and symptoms of generalized anxiety.  Id. at 74-75.

Mathur's claim that the Bureau of Prisons is not equipped to provide him the care he

needs is baseless.  "[A] defendant's unique mental or emotional condition is only relevant if the

Bureau of Prisons does not have adequate treatment services.  Adequate treatment services are

'services at a level reasonably commensurate with modern medical science and of a quality

acceptable within prudent professional standards."  United States v. Studley, 907 F.2d 254, 259

(1st Cir. 1990), citing United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987).   Mathur has

not shown the BOP cannot provide adequate treatment services.

**IV.      Government's Sentencing Recommendation**

The government recommends a sentence at the low-end of the GSR.  As shown by the

trial evidence, the PSR and the discussion above, this case involves a number of aggravating

factors that justify imposition of a substantial term of imprisonment.  Moreover, viewed in light

of the § 3553(a) factors, Mathur's conduct presents troubling aspects merit further elucidation

beyond the numeric quantifier established by the Guidelines.  The most salient non-guidelines

factors here are "the nature and circumstances of the offense and the history and characteristics

of the defendant"; the need for the sentence imposed . . . to reflect the seriousness of the offense,

to promote respect for the law, . . . to provide just punishment for the offense; . . . [and] to afford

adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(1) and (2)(A) and (D).

Unlike many defendants who appear before this Court, Mathur was given every

opportunity in life.  He is the only child of two successful professionals.  He grew up in an upper

class neighborhood and had ample educational opportunities.   He nonetheless chose to use his

talents and skills to deceive those who trusted him most.  His crimes are serious and deserve

equally serious punishment.  See United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006)

("[T]he minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money and earning potential to buy their way out of jail" are relevant factors to consider in sentencing a defendant.).

In light of the egregiousness of Mathur's conduct, his indifference to the harm he caused his victims, his attempts to obstruct justice and avoid responsibility, and his continued utter lack of contrition, a guideline sentence is warranted.

Alok and Aparajita Mathur describe the betrayal they felt due to the defendant's actions and the devastating consequences that betrayal has had on them:

> Amit exploited Alok's close family relationship with his parents to lure us into making these investments, making a series of statements and assertions concerning his prowess as an investment adviser (we found out subsequently that he had been fired by an investment banking firm).

> Amit was aware that we were literally investing everything we had with him and that we were relying on a conservative investment strategy to preserve our capital.

> When Alok lost his job and started his own business, we called [Mathur] specifically to request that our money be returned because we did not want to risk our life savings at a time when we could ill afford to take such risks.  He again reassured us that the investments were continuing to do exceptionally well; accruing a much higher return compared to the general stock market; and that these investments would secure our financial needs in the future.

> *     *     *

> The loss of all our capital arising from Amit's fraud and deception has devastated us financially.  It has affected adversely the college education of our two sons, who were forced to make choices based on financial need.  It had always been one of our top priorities to make sure that they attend a college of their choice, without money becoming a major consideration.

Similarly, David Massad, a successful businessman, trusted Mathur and was in turn deceived by him.  In addition to losing millions of dollars of his own money, Massad recommended Mathur's services to family members, who were also swindled.  Massad speaks of how Mathur's "betrayal has affected [him] emotionally, financially, and physically."  He speaks

of public humiliation and sleepless nights.  In addition, police officer Stephen LoGrasso testified

to losing the college fund he had established for his children.  T.2:144.

In these circumstances, a 210 month sentence is warranted to promote general deterrence

as well as to avoid unwarranted sentence disparities.  As the First Circuit has stated, "Deterrence

of white collar crimes is of central concern to Congress." <u>Mueffelman</u>, 470 F.3d at 40; <u>see also</u>

<u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-

based crimes are more rational, cool, and calculated than sudden crimes of passion or

opportunity, these crimes are prime candidates for general deterrence." (internal quotation mark

omitted)).

Most remarkable is Mathur's lack of contrition and refusal to accept responsibility for his

crimes, as demonstrated by his version of the offense conduct.  PSR ¶¶17-23.  To this date,

Mathur blames his victims and his accomplice and, against the overwhelming weight of the

evidence, refuses to accept the seriousness of his conduct or the appropriateness of a

commensurately serious sentence.

**Conclusion:**

For all these reasons, the United States recommends a sentence of incarceration for 210

months, a five-year period of supervised release, a mandatory special assessment of 2,000, and

complete restitution.

Respectfully submitted,

MICHAEL K. LOUCKS
Acting United States Attorney

By:    /s/ *John A. Capin*

JOHN A. CAPIN
Assistant U.S. Attorney
(617) 748-3264

20

<u>CERTIFICATE OF SERVICE</u>

       I, John A. Capin, Assistant U.S. Attorney, do hereby certify that I have, on this date, caused a true and accurate copy of the foregoing to be served upon counsel of record by filing the document with the Court electronically.

Date:  May 7, 2009                    /s/ *John A. Capin*

                                         JOHN A. CAPIN
                                         Assistant U.S. Attorney